UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| BEAR'S RESTAURANT GROUP and GONDOLIER PIZZA INTERNATIONAL, INC., individually and on behalf of others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>AGRI STATS, INC., CLEMENS FOOD GROUP, LLC, HORMEL FOODS CORPORATION, INDIANA PACKERS CORPORATION, JBS USA FOOD COMPANY, SEABOARD FOODS, LLC, SMITHFIELD FOODS, INC., TRIUMPH FOODS, LLC, and TYSON FOODS, INC.<br><br>      Defendants. | No. 18-cv-02113<br><br><br><br>CLASS ACTION COMPLAINT<br><br><br><br><br>JURY TRIAL DEMANDED |

Plaintiffs bring this action on behalf of themselves individually and on behalf of a class consisting of all persons and entities who purchased pork indirectly from a defendant or co-conspirator for their own business use in commercial food preparation in the United States from at least January 1, 2009 until the present (Class Period). Plaintiffs bring this action for injunctive relief under Section 1 of the Sherman Act, and for treble damages under the antitrust laws, unfair competition laws, deceptive trade practice

and consumer protection laws, and unjust enrichment common laws of the several states against defendants, and demands a trial by jury.

## NATURE OF THE ACTION

1.    The pork integrator-defendants are the leading suppliers of pork in an industry with approximately $20 billion in annual commerce. The pork industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants and their co-conspirators collectively control over 80 percent of the wholesale pork market.

2.    These defendants, Agri Stats, Inc. (Agri Stats), Clemens Food Group, LLC (Clemens), Hormel Foods Corporation (Hormel), Indiana Packers Corporation (Indiana Packers), JBS USA Food Company, Seaboard Foods LLC (Seaboard), Smithfield Foods, Inc. (Smithfield), Triumph Foods, LLC (Triumph), and Tyson Foods, Inc. (Tyson), entered into a conspiracy from at least 2009 to the present to fix, raise, maintain and stabilize the price of pork.[1] The principal (but not exclusive) method by which defendants implemented and executed their conspiracy was by coordinating their output and limiting production with the intent and expected result of increasing pork prices in the United States. In furtherance of their conspiracy,

---

[1] For the purposes of this complaint, pork includes pig meat purchased fresh or frozen, smoked ham, sausage and bacon.

defendants exchanged detailed, competitively sensitive, and closely guarded non-public information about prices, capacity, sales volume and demand through their co-conspirator Agri Stats.

3.     Beginning in at least 2009, Agri Stats began providing highly sensitive "benchmarking" reports to the majority of pork integrators. Benchmarking allows competitors to compare their profits or performance against that of other companies. But Agri Stats' reports are unlike those of other lawful industry reports. Agri Stats gathers detailed financial and production data from each of the pork integrators, standardizes this information, and produces customized reports and graphs for the co-conspirators. The type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market. Instead, the provision of this detailed information acts as the proverbial smoke-filled room of the cartels of yesteryear. Rather than meeting in a room with pen and paper, Agri Stats collected the pork integrators' competitively sensitive supply and pricing data and intentionally shared that information through detailed reports it provided to the pork integrators. On a weekly and monthly basis, Agri Stats provides the pork integrators with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information), as well as regularly provides the keys to deciphering which data belongs to which producers. The effect of

this information exchange was to allow the pork integrators to monitor each other's production and hence control supply and price.

4.     The data exchanged through Agri Stats bears all the hallmarks of the enforcement mechanism of a price-fixing scheme. First, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[2] Second, information contained in Agri Stats reports is specific to the pork producers, including information on profits, prices, costs and production levels. "Courts prefer that information be aggregated in the form of industry averages, thus avoiding transactional specificity."[3] Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service which required the co-conspirators to pay millions of dollars over the class period – far in excess of any other pricing and production indices. "Public dissemination is a primary way for data exchange to realize its pro-competitive potential."[4] Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market.

---

[2] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

[3] *Id.* at 212.

[4] *Id.* at 213.

5.    In addition to this public information, the swine producers admitted in public calls that they had discussed production cuts at least once, and publicly signaled to each other that no supply increases would happen.

6.    In addition, there are numerous "plus factors" in the swine industry during the class period, including but not limited to multiple industry characteristics which facilitate collusion, such as high vertical integration, high barriers to entry, high pork industry consolidation and concentration, inelastic supply and demand, and a lack of significant substitutes for pork. These plus factors add plausibility to plaintiffs' allegations of a price fixing scheme.

7.    Defendants' restriction of pork supply had the intended purpose and effect of increasing pork prices to plaintiffs and class members. Beginning in 2009, the earnings of the integrators began to increase, as they took an increasing amount of the profits available in the pork industry. As a result of defendants' unlawful conduct, plaintiffs and the classes paid artificially inflated prices for pork during the class period. Such prices exceeded the amount they would have paid if the price for pork had been determined by a competitive market. Thus, plaintiffs and class members were injured by defendants' conduct.

## JURISDICTION AND VENUE

8.      Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also bring these state law class claims on behalf of all the classes to recover actual and compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by defendants' conduct in restricting the supply of pork and increasing the price of pork. Plaintiffs seek damages in excess of $5,000,000 and there are more than 100 members in each of the classes. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

9.      Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because one or more defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

10.      This Court has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States,

including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

11.    The activities of the defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

## PARTIES

### A.    Plaintiffs

12.    Plaintiff Bear's Restaurant Group resides and has its principal place of business in South Windsor, Connecticut. Bear's Restaurant Group indirectly purchased pork during the Class Period for business use in commercial food preparation at its five restaurants and catering operation in Connecticut.

13.    Plaintiff Gondolier Pizza International, Inc., resides and has its principal place of business in Clearwater Beach, Florida. Gondolier Pizza International Inc., indirectly purchased pork during the Class Period for business use in commercial food preparation at its 41 restaurants in Florida, Georgia, Tennessee, Kentucky, and North Carolina.

**B.     Defendants**

14.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co. Throughout the Class Period, Agri Stats acted as a co-conspirator of Defendants Producers by facilitating the exchange of confidential, proprietary, and competitively sensitive data among defendants and their co-conspirators.

15.     Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania. During the class period, Clemens and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

16.     Hormel Foods Corporation is a Delaware corporation engaged in the production of meat and food products, and the marketing of these products. Hormel Foods is headquartered in Austin, Minnesota. During the Class Period, Hormel Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

17.     Indiana Packers Corporation is an Indiana corporation engaged in the production of meat and food products, and the marketing of these products. Indiana Packers is headquartered in Delphi, Indiana. During the

Class Period, Indiana Packers and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

18.     JBS USA Food Company ("JBS USA") is one of the world's largest beef and pork processing companies and an indirect wholly owned subsidiary of Brazilian-based JBS SA. JBS USA is a wholly owned subsidiary of JBS USA Holdings, Inc., which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world. JBS USA is a Delaware corporation, headquartered in Greeley, Colorado. During the Class Period, JBS USA and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

19.     Seaboard Foods LLC is a limited-liability company headquartered in Shawnee Mission, Kansas. During the Class Period, Seaboard Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

20.    Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, the largest pork company in the world.[5] Smithfield Foods is headquartered in Smithfield, Virginia. During the Class Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

21.    Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri. During the class period, Triumph Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

22.    Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

---

[5]    2014 Annual Report, WH Group at 175, Smithfield, https://www.smithfieldfoods.com/investor-relations (last visited June 26, 2018).

# FACTUAL ALLEGATIONS

23.    Starting in at least 2009 and continuing to the present, defendants coordinated to fix, raise, maintain and stabilize pork prices. To effectuate and ensure the stability of their price-fixing agreement, defendants relied on a unique industry data sharing service known as Agri Stats. Agri Stats provided a means for defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of defendants' price-fixing scheme, resulting in a remarkably stable and successful anticompetitive cartel.

## A.    The price-fixing scheme started from Agri Stats' central role in collusion in the broiler industry.

24.    Agri Stats has played a central role in other industries, including collusion in the broiler industry.[6] As alleged in the *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill.), the broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices.

25.    In the broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production

---

[6] Broilers are chickens raised to be slaughtered before the age of 13 weeks.

volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain **line-by-line** entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets, Inc. or EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

26.    The detail of these reports ensured that competitors could quickly decode the information of their erstwhile competitors. The *Broiler* complaints allege it was common knowledge that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in parts, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this

information to top executives to facilitate agreement on supply, constraints, and price.

27.    In the broiler industry, it is also alleged that Agri Stats – known to its co-conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply – where Agri Stats would transmit the intentions of the broiler producers to restrict supply.

28.    The district court noted, in denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litigation* that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.[7]

## B.    After success in the broiler industry Agri Stats markets its collusive scheme to the swine integrators.

29.    Beginning in at least 2008, Agri Stats began to propose a series of benchmarks to the swine industry along the lines of the benchmarks used to

---

[7] Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

restrict competition in the broiler industry. Benchmarking is the act of comparing practices, methods or performance against those of other companies.[8] Benchmarking, of the type undertaken by Agri Stats and its co-conspirators here, reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition. This is especially true where benchmarking involves the exchange of commercially sensitive information between competitors.

30.     In 2008, Greg Bilbrey of Agri Stats told swine industry producers that "Benchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. *Each and every commercial swine operation is encouraged to participate in some benchmarking effort*."[9]

31.     Agri Stats emphasized to pork producers that the goal of the conspiracy (and the agreement to share information) was profitability, not production, and invited pork producers again, to participate in the

---

[8] *Antitrust Issues Related to Benchmarking and Other Information Exchanges*, Federal Trade Commission (May 3, 2011), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/antitrust-issues-related-benchmarking-and-other-information-exchanges/110503roschbenchmarking.pdf.

[9] Greg Bilbrey, *Benchmarking and Cost – Production Relationships*, 19 Advances in Pork Production Journal, 43 (2008).

benchmarking. Agri Stats emphasized that "We must remember that the **ultimate goal is increasing profitability** – not always increasing the level of production." Furthermore, Agri Stats told the industry that "[e]ach swine production company should be participating in some type of benchmarking. **To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program**."[10]

32.    In April 2009, Agri Stats again invited swine producers to design and operate their own benchmarking effort. Greg Bilbrey of Agri Stats invited swine producers to design and operate their own benchmarking effort: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. **Producer groups could design and operate their own benchmarking effort**."[11]

33.    The pork producers did accept this offer, and beginning no later than 2009, created the detailed benchmarking scheme based upon and found in the Agri Stats reports. The agreement between the defendants was to use the exchanged benchmarking information to reduce the supply and stabilize the prices of pork sold in the United States, to provide and receive

---

[10] *Id*. at 41-46.

[11] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

information from Agri Stats, and to use this detailed sensitive information for the purposes of monitoring each other's production and pricing. As set forth below, so as to maintain a reduction of production and an increase of price. The agreement was successful as prices rise significantly after the agreement was reached.

34. The scope of commerce of the pork industry is enormous. Total pork sales in the United States were:

> 2016 - $18.9 billion
> 2015 - $21.0 billion
> 2014 - $26.4 billion
> 2013 - $23.4 billion

35. Each defendant's annual sales of pork products are also immense. For example, in 2016 Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales. That same year, Tyson reported $4.9 billion in pork sales. With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has enormous consequences to profits.

## C. Agri Stats provided pork integrators the unparalleled ability to monitor, or discipline co-conspirators for not complying with the collusive agreement.

36. Agri Stats provided pork integrators with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as production levels and short and long-term production

capacity. Agri Stats was key to the formation, operation and continuing stability of the defendants' price-fixing scheme. In order to organize an effective price-fixing agreement, the participants had to have confidence that each member was following through with the agreement by limiting their production and stabilizing prices. Agri Stats served that function here.

37.     Each member of the conspiracy, including swine integrators and defendants Clemens, Hormel, Indiana Packers, JBS USA, Seaboard, Smithfield, Triumph, and Tyson, were all Agri Stats subscribers. Agri Stats' parent company, Eli Lilly, stated that "***over 90% of the poultry and pig market***" uses Agri Stats in the United States.[12]

38.     Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's financial data is reconciled to their general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations so all company numbers are calculated the same way.[13]

---

[12] Transcript, Eli Lilly and Co. at Morgan Stanley Global Healthcare Conference (Sept. 13, 2016).

[13] Greg Bilbrey, *Implementing Simple and Useful Production Benchmarking*, London Swine Conference – A Time for Change (March 28-29, 2012).

39. Participants in the scheme received monthly detailed reports and graphs that allow them to compare their performance and costs to other participants, the average of all companies, the top 25 percent and the top five companies. Current month, previous quarter and previous twelve-month periods are reported. As of 2009, each monthly report contained nine sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul, Profit and Sales.[14] Participants may also receive an abbreviated Key Performance Indicator report, as well as, historical graphs.[15]

40. Because of the nature of the life of a hog, even current and historical information regarding the production numbers of hogs provides forward-looking supply information to competitors. The typical hog production cycle lasts about 4 years. This is a function of the hog biological cycle. Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and breed and rear the resulting crop of piglets, it takes nearly 2 years to substantially increase production.

---

[14] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit, supra* note 11.

[15] Greg Bilbrey, *Benchmarking and Cost-Production Relationships, supra* note 10.

41.    One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the pork market:[16]

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

35,001,089 Pigs Finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | | 9 | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

42.    The purpose of these reports was not to provide better prices to consumers or to lower the costs of production. Instead the clear purpose was to improve the profitability of the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability, and compares the company to its competitors by providing the variance from the average. On information and belief, the Agri Stats report actually circulated to competitors contained even further detail. The same

---

[16] Greg Bilbrey, *Key Drivers to Farm Profitability* (2011).

presentation informed pork integrators that one of the "Advantages for Top 25% in Profit" was the "Sales Price: $2 - $6/ckg." (CKG refers to 100 kilograms.) This underlines that the purpose of these reports was not to allow consumers to save more money through lower prices and more efficient production – in fact, the opposite was true, the purpose was the profitability of the defendant companies and the impact was higher sales prices for consumers.

43.    Much of the information shared by Agri Stats and the co-conspirators was unnecessary to achieve any benefits for consumers. Exchanging individual company data (particularly current data on prices and costs), is not required to achieve major efficiencies.[17]

44.    Agri Stats knew that it played a central role in this conspiracy. Agri Stats repeatedly touted its role in standardizing the costs across companies – allowing the companies to compare the "apples to apples" of its data analysis between competitors. One presentation from Agri Stats spoke directly on this point, pointing out to industry participants that they could

---

[17] *FTC Roundtable on Information Exchanges Between Competitors Under Competition Law* Organization for Economic Cooperation and Development, (Oct. 21, 2010) at 6, https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf.

not undertake such a detailed cost analysis between competitors without Agri

Stats auditing and standardizing the data:[18]

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



45.    Agri Stats stated that to ensure data contained in the reports was

accurate, the participants had to "[A]gree on calculation and data collection

procedures," they must "[d]etermine **tolerance and outlier status and**

**enforce**," they must "[h]ave an administrator to compile the data and enforce

procedures," and most importantly, "**[e]ach participant has to commit**."[19]

---

[18]    Greg Bilbrey, *Data Integrity*, Slideshare.net (Sept. 21, 2015), https://www.slideshare.net/trufflemedia/greg-bilbrey-data-integrity-using-records-for-benchmarking-and-operations.

[19] *Id*.

46.    In addition to these reports, Agri Stats' account managers conduct on-site live reviews to assist with report utilization and analysis.[20] The information provided by Agri Stats was so detailed that clients frequently requested the site visits by Agri Stats employees to assist the co-conspirators in understanding the intricacies and implications of the data. Agri Stats' employees each possessed expertise in a specific area of production, and the value added by their insights was as important to the producers as the data in the books. The fee for the visits fluctuated based on the size and other factors.

47.    A common saying in the Agri Stats circle is "you cannot produce your way to the top of the page." Rather, Agri Stats has stated that "***the ultimate goal is increasing profitability*** – not simply increasing level of production."

48.    In May 2015, a subsidiary of Agri Stats, Express Markets, announced that it was adding its market analysis of pork to their product offerings in order to meet the broad information and knowledge needs of its customers. Express Markets started providing its extensive pricing reports to broiler producers in 2003.[21]

---

[20] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *supra* note 11.

[21] Steve Meyer, *Paragon Economics Sold to Express Markets*, National Hog Farmer, May 26, 2015, *available at*

49.    By providing detailed production statistics by producer, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans for coordinated production limits. Critically, Agri Stats provided forward-looking data that allowed the co-conspirators to determine each other's future production in addition to their current production.

50.    Agri Stats reports are organized by company and facility, but the producers' names are not listed in the reports. Nevertheless, while nominally anonymous, the reports contain such detailed figures covering every aspect of pork production and sales that producers can accurately identify the companies behind the metrics. For example, long-time industry insiders are sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics and size.

51.    Moreover, Agri Stats knew that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers, but reassigning numbers was an arduous undertaking the company was not eager to embark on.

---

http://www.nationalhogfarmer.com/marketing/paragon-economics-sold-express-markets.

52.    Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information. Within these smaller monthly books, each Supplier's own rows of year-to-date numbers were highlighted. In the front of each book, there were also markings indicating whose numbers were inside the book. The front of the book also included information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

53.    Agri Stats mailed the reports to customers. On occasion, Agri Stats shipped a producer's book to one of its competitors. At times, suppliers just kept their competitors' books for future reference, which as noted above revealed the identity of that producer given that their numbers were highlighted by Agri States in their books.

54.    Mobility within the meat production industries led to a situation where many workers at most pork production operations knew the numbers of other regional facilities, removing any anonymization of the data which existed. Agri Stats would hire industry participants to work in their offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers. Those working at Agri Stats noticed this problem almost immediately, but did nothing to fix the problem.

55.    Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and manipulate prices, but also in its stabilizing power. Price-fixing cartels are subject to inherent instability in the absence of policing mechanisms, as each individual member of the cartel may have incentive to cheat on other members of the cartel, for example by ramping up pork production to capture higher prices as other cartel members act to limit production. Agri Stats' detailed production statistics serve as an indispensable monitoring function, allowing each member of the cartel to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

56.    In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the broiler industry, it was reported:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This

is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "***That is what creates stability for a cartel***."[22]

## D.    The pork industry is nearly fully vertically integrated, which allowed the scheme to succeed.

57.    The pork production industry is almost completely vertically integrated, with four major producers controlling 75 percent of pork integration. Very large pork producers are commonly characterized as "contractors" or "integrators" who contract production of their hogs out to independent growers.[23] Integration is so pervasive that major producers are commonly called pork or swine integrators by the industry, government, analysts and academics.

58.    In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States. Smithfield described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs

---

[22] Christopher Leonard, *Is the Chicken Industry Rigged*, Bloomberg, (Feb. 15, 2017),https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged.

[23] Vertical Integration in the Pork Industry, University of Oregon (July 2005).

> raised by our contract farmers. In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.[24]

59.    Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when. As is clear from Smithfield's annual report, under these arrangements, the pork integrators pay only fixed service fees to the farmers, who bear all of the investment costs of the hog raising facilities. The pork integrator, here Smithfield, retains ownership of the hogs at all points in time. This arrangement essentially converts independent farmers that own their livestock into contract employees that perform services for the pork-packing industry.

**E.    The level of concentration in the pork industry was optimal for the alleged collusive scheme.**

60.    Prior and in the beginning of the class period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork integrators controlling a large amount of market share. Between 1988 to 2015, the top four pork integrators (Smithfield, Tyson, JBS and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015. The top eight integrators had market share of well over 80 percent for the entire class period:

---

[24] Smithfield Foods Annual Report, at 27 (2014).

**Figure 1: Market Share of Top 8 Pork Integrators 1991 to 2017**



Source: USDA Packers and Stockyards Program Reports (PSP) 1998-2006, Daily Slaughter Capacity Published by EMI.Inc.
Notes: 2007-2017 Market Share by Top 8 Hog Integrators were estimated from Integrator's Daily Slaughter Capacity.

61.    The hog production sector is horizontally concentrated (only a few companies buy, slaughter and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production). Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

62.    In July 2015, JBS USA announced it would be acquiring Cargill's pork business for $1.45 billion. The acquisition joined the third and fourth

largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield.

63.    The acquisition completed in October 2015 and resulted in further consolidation in the industry. The resulting pork business had pro forma net revenue of approximately US$6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week.[25] After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork integrator (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under five percent of the national slaughter capacity).[26]

64.    Barriers to entry kept competitors out of the pork packing industry. New entry into pork processing is costly and time consuming. Construction of a large-scale slaughter facility would take hundreds of millions of dollars and the additional planning, design and permitting costs are substantial. In 2012, it cost Cargill $25 million just to expand an existing facility. Building a facility from scratch would be considerably more.[27]

65.    The concentration level in the pork industry was optimal for collusion.    WH    Group    Limited,    the    parent    company    of    Smithfield,

---

[25] JBS Concludes Cargill Pork Acquisition (Oct. 30, 2015).

[26] *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition*, at 4 (White Paper).

[27] *Id*. at 7.

characterized the U.S. market pork industry as "relatively mature and concentrated."[28] Both of these factors – maturity and concentration – make an industry more susceptible to collusion.

66.     The level of concentration in the pork industry therefore rested in an ideal zone for collusion. Because the industry was dominated by a relative handful of integrators, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further, because none of the largest producers were capable of independently controlling price through their own production, such an agreement was necessary to inflate price.

**F.     Abnormal pricing during the class period demonstrates the success of the collusive scheme.**

67.     Beginning in 2009, the pork industry showed abnormal price movements. According to aggregate prices published by the USDA, the hog market year average price was at or below $50 every year between 1998 and 2009, before increasing to $76.30 in 2015. The following graph shows the unprecedented increase in swine prices beginning in 2009, and staying elevated through 2018:

---

[28] WH Group Interim Report, at 5 (2017).

**Figure 2: Average Hog Wholesale Prices in Cents per lbs, 2000-2018**



As this figure demonstrates, pork wholesale prices increased in 2009 and 2014, and continuously remained at this higher level compared to the years prior to 2009.

68.    Publicly available (albeit aggregated data) also shows that during this period, whole price variation/risk was almost entirely shouldered by farmers, while the pork integrators' earnings increased steadily over the years 2009 to 2017, with a slight decline in 2017:

**Figure 3: Integrators and Farmers (Growers) Earning per Retail weight, 2000-2017**



### G.    Capacity and supply restraints during the class period.

69.    As demonstrated in the following chart, at several points during the class period, the pork integrators acted in a concerted way to decrease supply. In 2009, 2010, and again in 2013, the pork industry cut production. (The production dip in 2014 reflected the adverse impacts from the deadly pig disease, porcine epidemic diarrhea virus, which took place in the spring and summer of 2014.) The decreases in production largely occurred after decrease in pork wholesale prices:

**Figure 4: U.S. Annual Commercial Hog Production by Weight, 2000-2017**



70.    In public earnings calls, defendants made statements regarding their intentions to either stabilize or decrease supply (although gave false reasons for this stabilization). For example: in May 2009, Larry Pope, the CEO and President of Smithfield stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year-- February of '08, not February of '09--*we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down. We started a reduction of 50,000 sows and 1 million*

> ***of our 18 million pigs, we started taking out of
> the system***.[29]

71. In May 2009, Hormel confirmed that "We see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated. And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year."[30]

72. In June 2009, the CEO of Smithfield stated that the current cuts were not enough and more were needed to "fix" the hog industry and that "Somebody else has got to do something":

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our -- I'll tell you, it's our Texas operation that sells pigs to seaboard. Seaboard knows that. . . . ***That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something.*** We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.[31]

73. In September 2009, the CEO of Smithfield stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

---

[29] Smithfield Foods at BMO Capital Markets Agriculture, Protein & Fertilizer Conference – Final (May 13, 2009).

[30] Q2 2009 Hormel Foods Corporation Earnings Conference Call – Final (May 21, 2009).

[31] Q4 2009 Smithfield Foods Earnings Conference Call – Final (June 16, 2009).

> ***We can't solve the problem. But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation.*** But again, I don't think they can solve it.
>
> I think this industry has got to solve it collectively. I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong. ***But the answer is, yes, there are others cutting back. We're not the only one.***[32]

74. In March 2010, when asked about fourth quarter and 2011 volumes for pork, Larry Pope, the CEO of Smithfield indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year. That's going to have the impact starting next fiscal year when there is going to be 13,000 less. But I think we'll pick up some of that in our other operations. But I think 8,000 or 9,000 or 10,000 of those a day will disappear from our operations and that represents about 8% of our, 8% of the hogs will be down. That's for also the fresh pork side.[33]

75. The pork producers acknowledged access to information that allowed them to know that the supply of pork would not be increasing. For example, in December 2010, Larry Pope, the CEO of Smithfield stated:

---

[32] Event Brief of Q1 2010 Smithfield Foods Earnings Conference Call (Sept. 8, 2009).

[33] Event Brief of Q3 2010 Smithfield Foods Earnings Conference Call – Final (Mar. 11, 2010).

> We certainly compare ourselves to our competitors as best we can. ***Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to. This is information you may not quite have.*** And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.[34]

Smithfield had access to competitively sensitive information from its competitors, through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

76.    Supply level information regarding competitors allowed them to know that supply would not increase in the future, given the lifecycles of the animals. In February 2011, Tyson's chief operating officer (COO) stated:

> I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable. I want to again explain why we don't believe that is true. If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.

Again, the way to know the level of production in the industry would be through the provision of competitively sensitive information by a competitor of Tyson.

---

[34] Event Brief of Q2 2011 Smithfield Foods Earnings Conference Call – Final (Dec. 2010).

77.     When asked, in the face of ever-increasing margins, whether the type of profits would continue, in March 2011, Smithfield publicly signaled to its competitors that it would not increase capacity, even in the face of the clear profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs. Yet we are projecting over the next 90 days we will be up another 20% from that. I mean those are big numbers to get the meat prices in the retail and food service case to cover that. . . .
>
> HEATHER JONES: So you are just striking a note of caution *because you know it can't stay this way indefinitely*; but it's not that you foresee this reversion to that norm over the near term?
>
> BO MANLY: I don't see it on the horizon, on the foreseeable horizon. We are still going to have -- should have good margins, but I can't believe --
>
> LARRY POPE: Heather, we are sitting here today, we are halfway -- closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today. We have got double-digit margins today.
>
> BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower. So it will either happen by itself or someone is going to build a plant.
>
> HEATHER JONES: All right, okay. Thank you.
>
> LARRY POPE: You get two-year visibility on that, though. You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing. . . . *And by*

> *the way, we are not going to build a new plant to expand capacity.*[35]

78.    In March 2012, the VP of Finance and chief accounting officer of Smithfield stated that no one in the industry would be "real excited about adding capacity" when the losses of 24 to 36 months ago were considered:

> Nonetheless, you see some pretty significant fluctuations. Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30. So there is some volatility there. And what I would tell you is that keeps a lid on pork production. The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry. ***There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility.***[36]

## H.    Overcharges due to the cartel were passed through to the indirect purchaser class.

79.    The USDA has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality."[37]

---

[35] Event Brief of Q3 2011 Smithfield Foods Earnings Conference Call – Final (Mar. 2011).

[36] Smithfield Foods at Barclays Bank High Yield Bond and Syndicated Loan Conference – Final (Mar. 26, 2012).

[37] John King (USDA), *Concentration and Technology in Agricultural Input Industries*, at 2 (March 2001).

80.    As a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to consumers in the form of higher retail prices. For a firm to be profitable, the firm must recover its marginal cost of production. In a perfectly competitive market, firms price at marginal cost and when marginal costs increase, the cost increases are passed through to the consumer 1:1 or at a 100 percent pass through rate. As a general matter, the pass through rate will be determined by the relative elasticities of supply and demand. When demand is inelastic (as it is for pork) the pass through rate is closer to 100 percent.

81.    The Bureau of Labor Statistics tracks commonly purchased products in its Consumer Price Index (CPI). Those prices show that the retail price of pork has increased substantially for consumers over the class period. For example, the price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.60 at the end of 2017:

\\

\\

\\

\\

\\

\\

**Figure 5: CPI-Average Price Data for Bacon, Sliced, per pound, from 1995-2017**



82. Similarly, the CPI index for other pork products, excluding canned ham and luncheon slices, show a marked increase over the class period, moving from $2.05 per pound at the end of 2009 to $2.65 at the end of 2017:

\\

\\

\\

\\

\\

\\

\\

**Figure 6: CPI-Average Price Data for Other Pork, per pound, from 1995-2017**



83.    And the CPI index for another commonly purchased consumer item, ham, shows an increase from $2.15 at the end of 2009 to $2.91 at the end of 2017:

**Figure 7: CPI-Average Price Data for Ham, per pound, from 1995-2017**



84.    Given these market conditions, the overcharge due to defendants' anticompetitive agreement to stabilize the price and supply of pork was passed on to the end consumers, the plaintiffs and classes here.

## I.    Defendants actively concealed the conspiracy.

85.    Throughout the class period, defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from plaintiffs and class members.

86.    The combination and conspiracy alleged herein was fraudulently concealed by defendants by various means and methods, including, but not limited to secret meetings, surreptitious communications between defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats - a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

87.    In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was, when he stated:

Agri Stats has always been kind of a quiet company. **There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background**, and really our specialty is working directly with companies about their opportunities and so forth.[38]

88. At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly stating "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information."[39] And yet, despite refusing to show this information publicly, competitors were provided with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above.. These statements acted to conceal the true detail and nature of the Agri Stats reports from plaintiffs and the public in general.

89. At other times, producers attributed the stability in the pork market to other reasons such as "good programs with our retailers" and "lower grain costs." As Larry Pope, the CEO Of Smithfield stated in June 2012:

KEN ZASLOW: What evidence do you have to actually give you some confidence that fresh pork

---

[38] Sanderson Farms Investor Day – Final (Oct. 2009).

[39] *Id.*

margins will improve sequentially throughout the year?

LARRY POPE: Strong exports, $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine. I guess beyond that, you've got chicken and beef that are going to be down significantly.

BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy.[40]

90.    By virtue of the fraudulent concealment of their wrongful conduct by defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that plaintiffs and the other class members have as a result of the unlawful combination and conspiracy alleged in this complaint.

## CLASS ACTION ALLEGATIONS

91.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking injunctive relief pursuant to federal law, and damages pursuant to various state antitrust, unfair competition, unjust enrichment, and deceptive trade practice and consumer protection laws of the states listed below on behalf of the members of the following classes:

---

[40] Event Brief of Q4 2012 Smithfield Foods Earnings Conference Call – Final (June 14, 2012).

**Nationwide Injunctive Relief class:** All persons and entities in the United States who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparationtheir own business use in commercial food preparation during the Class Period.

**Alabama Class:** All persons and entities in Alabama who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Alaska Class:** All persons and entities in Alaska who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Arizona Class**: All persons and entities in Arizona who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**California Class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Colorado Class:** All persons and entities in Colorado who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Delaware Class:** All persons and entities in Delaware who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**District of Columbia Class**: All persons and entities in the District of Columbia who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Florida Class:** All persons and entities in Florida who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Georgia Class:** All persons and entities in Georgia who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Hawaii Class:** All persons and entities in Hawaii who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Idaho Class:** All persons and entities in Idaho who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Illinois Class**: All persons and entities in Illinois who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Iowa Class:** All persons and entities in Iowa who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Kansas Class**: All persons and entities in Kansas who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Louisiana Class:** All persons and entities in Louisiana who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Maine Class**: All persons and entities in Maine who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Maryland Class:** All persons and entities in Maryland who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Massachusetts Class:** All persons and entities in Massachusetts who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Michigan Class:** All persons and entities in Michigan who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Minnesota Class:** All persons and entities in Minnesota who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Mississippi Class**: All persons and entities in Mississippi who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Missouri Class**: All persons and entities in Missouri who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Montana Class**: All persons and entities who in Montana indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Nebraska Class:** All persons and entities in Nebraska who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Nevada Class**: All persons and entities in Nevada who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**New Hampshire Class**: All persons and entities in New Hampshire who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**New Jersey Class:** All persons and entities in New Jersey who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**New Mexico Class**: All persons and entities in New Mexico who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**New York Class:** All persons and entities in New York who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**North Carolina Class**: All persons and entities in New York who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**North Dakota Class**: All persons and entities in North Dakota who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Oregon Class**: All persons and entities in Oregon who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Pennsylvania Class:** All persons and entities in Pennsylvania who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Puerto Rico Class:** All persons and entities in Puerto Rico who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Rhode Island Class**: All persons and entities in Rhode Island who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**South Carolina Class:** All persons and entities in South Carolina who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**South Dakota Class**: All persons and entities in South Dakota who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Tennessee Class**: All persons and entities in Tennessee who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Texas Class:** All persons and entities in Texas who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Utah Class**: All persons and entities in Utah who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Vermont Class:** All persons and entities in Vermont who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Virginia Class:** All persons and entities in Virginia who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Washington Class:** All persons and entities in Washington who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**West Virginia Class:** All persons and entities in West Virginia who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Wisconsin Class:** All persons and entities in Wisconsin who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

**Wyoming Class:** All persons and entities in Wyoming who indirectly purchased pork from Defendants or co-conspirators for their own business use in commercial food preparation during the Class Period.

92.    The state classes are collectively referred to as the "classes" unless otherwise indicated. Further excluded from the classes and National Injunctive Relief Class are purchasers of value-added products not

manufactured, supplied or processed by defendants, or otherwise not under the control of defendants.

93.    Numerosity: Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of defendants, retailers, resellers and other entities in the supply chain of pork. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

94.    Typicality: Plaintiffs' claims are typical of the claims of the members of the classes because plaintiffs purchased pork indirectly from one or more of the defendants for their own business use in commercial food preparation, and therefore plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the classes and the relief sought is common to the classes.

95.    Common Questions Predominate: There are questions of law and fact common to the classes, including, but not limited to:

A.    Whether defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of pork sold in interstate commerce in the United States;

B.    The identity of the participants of the alleged conspiracy;

C.    The duration of the conspiracy alleged herein and the acts performed by defendants and their co-conspirators in furtherance of the conspiracy;

D.    Whether the alleged conspiracy violated the antitrust and consumer protection laws of the various states;

E.    Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the plaintiffs and the other members of the classes;

F.    The effect of defendants' alleged conspiracy on the prices of pork sold in the United States, District of Columbia, and Puerto Rico during the Class Period;

G.    Whether plaintiffs and other members of the classes are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

H.    The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the classes, predominate over any questions affecting only individual members of the classes.

96.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the classes in that plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the classes who indirectly purchased pork from defendants and plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the classes.

97.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual

joinder of all damaged members of the classes is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the classes compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be practicably feasible for members of the classes to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

98.    The prosecution of separate actions by individual members of the classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

99.    Plaintiffs bring the classes on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, indirectly purchased one or more pork products that a defendant or co-conspirator produced for their own business use in commercial food preparation during the respective class periods.

100.   Defendants have acted on grounds generally applicable to the classes, thereby making final injunctive relief appropriate with respect to the classes as a whole.

## ANTITRUST INJURY

101.   Defendants' anticompetitive conduct had the following effects, among others:

A.     Price competition has been restrained or eliminated with respect to pork;

B.     The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.     Indirect purchasers of pork have been deprived of free and open competition; and

D.     Commercial and institutional indirect purchasers of pork who indirectly purchased pork for their own business use in commercial food preparation, including plaintiffs, paid artificially inflated prices.

102.   The pork that Plaintiffs and class members purchased was in substantially the same form as when they were initially sold by Defendants. As a result, the pork follows a traceable physical chain from Defendants to the Plaintiffs and class members, and the overcharges on pork can be traced from Defendants to Plaintiffs and class members.

103.   As discussed in detail above, as a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to purchasers in the form of higher prices.

104.   Consequently, while the direct purchasers were the first to pay supra-competitive prices, the overcharge was passed along the distribution chain and absorbed by Plaintiffs and class members when they purchased the pork for their own business use in commercial food preparation.

105.   Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution. Thus, the economic harm to plaintiffs and the class member can be quantified.

106.   The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of pork and, as a direct and foreseeable result, plaintiffs and the Classes paid supra-competitive prices for pork during the Class Period.

107.   By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury to their businesses or property, having paid higher prices for pork than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

108.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## LEGAL BASES FOR RELIEF

### Count 1
### Violation of Section 1 of the Sherman Act
### 15 U.S.C. §§ 1 and 3
### (On Behalf of Nationwide Class for Injunctive and Equitable Relief)

109.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

110.  Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 2009, and continuing through the present, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price for pork in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

111.  In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

A.    Fixing, raising, and stabilizing the price of pork; and

B.     Allocating among themselves and collusively reducing the production of pork.

112.   The combination and conspiracy alleged herein has had the following effects, among others:

A.     Price competition in the sale of pork has been restrained, suppressed, eliminated, or a combination of these effects, in the United States;

B.     Prices for pork sold by defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

C.     Those who purchased pork indirectly from defendants and their coconspirators for their their own business use in commercial food preparation have been deprived of the benefits of free and open competition.

113.   Plaintiffs and members of the classes have been injured and will continue to be injured in their businesses and property by paying more for pork purchased indirectly from the defendants and their co-conspirators for their their own business use in commercial food preparation than they would have paid and will pay in the absence of the combination and conspiracy.

114.   Plaintiffs and members of the classes are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

## Count 2
## Violations of State Antitrust Laws

115. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

116. The following legal bases for relief are pleaded under the antitrust laws of each jurisdiction identified below on behalf of the indicated class.

### Violation of Arizona's Uniform State Antitrust Act
### Ariz. Rev. Stat. § 44-1401, et seq.
### (On Behalf of the Arizona Class)

117. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

118. By reason of the conduct alleged herein, defendants have violated Arizona Rev. Stat. § 44-1401, *et seq.*

119. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Arizona.

120. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Arizona, for the purpose of

58

excluding competition or controlling, fixing, or maintaining prices in the pork market.

121.  Defendants' violations of Arizona law were flagrant.

122.  Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

123.  As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Arizona Class have been injured in their business or property and are threatened with further injury.

124.  By reason of the foregoing, plaintiffs and members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq.*

### Violation of California's Cartwright Act
### Cal. Bus. & Prof. Code § 16700, et seq.
### (On Behalf of the California Class)

125.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

126.  The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

127.  California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a

free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

128.   Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

129.   A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

130.   Plaintiffs purchased pork within the State of California during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

131.   Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq*.

132.   Plaintiffs and members of the California Class were injured in their business or property, with respect to purchases of pork in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

## Violation of the District of Columbia Antitrust Act
## D.C. Code § 28-4501, et seq.
## (On Behalf of the District of Columbia Class)

133. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

134. The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

135. Plaintiffs purchased pork within the District of Columbia during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

136. Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "any indirect purchaser in the chain of manufacture, production or distribution of goods . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

137. Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to

monopolize the market for pork within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq.*

138.   Plaintiffs and members of the District of Columbia Class were injured with respect to purchases of pork in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

**Violation of the Illinois Antitrust Act**
**740 Ill. Comp. Stat. Ann. 10/3(1), et seq.**
**(On Behalf of the Illinois Class)**

139.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

140.   The Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade. . . ." 740 ILCS 10/2.

141.   Plaintiffs purchased pork within the State of Illinois during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

142. Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).

143. Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for pork sold, and/or for allocating customers or markets for pork within the intrastate commerce of Illinois.

144. Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for pork in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, et seq.

145. Plaintiffs and members of the Illinois Class were injured with respect to purchases of pork in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

**Violation of the Iowa Competition Law**
**Iowa Code § 553.1, et seq.**
**(On Behalf of the Iowa Class)**

146. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

147. The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

148. Plaintiffs purchased pork within the State of Iowa during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

149. Defendants contracted, combined or conspired to restrain or monopolize trade in the market for pork, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for pork, in violation of Iowa Code § 553.1, *et seq.*

150. Plaintiffs and members of the Iowa Class were injured with respect to purchases of pork in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

## Violation of the Kansas Restraint of Trade Act
## Kan. Stat. Ann. § 50-101, et seq.
## (On Behalf of the Kansas Class)

151. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

152. The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the

importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

153.  Plaintiffs purchased pork within the State of Kansas during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

154.  Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

155.  Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of pork, increasing the price of pork, preventing competition in the sale of pork, or binding themselves not to sell pork, in a manner that established the price of pork and precluded free and unrestricted competition among themselves in the sale of pork, in violation of Kan. Stat. Ann. § 50-101, *et seq*.

156.  Plaintiffs and members of the Kansas Class were injured with respect to purchases of pork in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

## Violation of the Maine's Antitrust Statute
## Me. Rev. Stat. Ann. Tit. 10 § 1101, et seq.
## (On Behalf of the Maine Class)

157.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

158.  Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

159.  Plaintiffs purchased pork within the State of Maine during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

160.  Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

161.  Defendants contracted, combined or conspired in restraint of trade or commerce of pork within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of pork within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

162.   Plaintiffs and members of the Maine Class were injured with respect to purchases of pork in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

**Violation of the Michigan Antitrust Reform Act**
**Mich. Comp. Laws § 445.771, et seq.**
**(On Behalf of the Michigan Class)**

163.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

164.   The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit monopolies and attempts to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

165.   Plaintiffs purchased pork within the State of Michigan during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

166.   Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

167.   Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in the market for pork, in violation of Mich. Comp. Laws § 445.772, *et seq*.

168.   Plaintiffs and members of the Michigan Class were injured with respect to purchases of pork in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

### Violation of the Minnesota Antitrust Law
### Minn. Stat. § 325D.49, et seq.
### (On Behalf of the Minnesota Class)

169.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

170.   The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

171. Plaintiffs purchased pork within the State of Minnesota during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

172. Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

173. Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for pork within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for pork within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for pork within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq*.

174. Plaintiffs and members of the Minnesota Class were injured with respect to purchases of pork in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

### Violation of the Mississippi Antitrust Statute
### Miss. Code Ann. § 74-21-1, et seq.
### (On Behalf of the Mississippi Class)

175.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

176.   Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

177.   Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

178.   Plaintiffs purchased pork within the State of Mississippi during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

179.   Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

180.   Defendants combined, contracted, understood and agreed in the market for pork, in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of pork and hindering competition in the sale of pork, in violation of Miss. Code Ann. § 75-21-1(a), *et seq.*

181.   Defendants monopolized or attempted to monopolize the production, control or sale of pork, in violation of Miss. Code Ann. § 75-21-3, *et seq.*

182.   Defendants' pork is sold indirectly via distributors throughout the State of Mississippi. During the Class Period, defendants' illegal conduct substantially affected Mississippi commerce.

183.   Plaintiffs and members of the Mississippi Class were injured with respect to purchases of pork in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**Violation of the Nebraska Junkin Act**
**Neb. Rev. Stat. § 59-801, et seq.**
**(On Behalf of the Nebraska Class)**

184.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

185.   Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the

Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

186.   Plaintiffs purchased pork within the State of Nebraska during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

187.   Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

188.   Defendants contracted, combined or conspired in restraint of trade or commerce of pork within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for pork within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq*.

189.   Plaintiffs and members of the Nebraska Class were injured with respect to purchases of pork in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## Violation of the Nevada Unfair Trade Practices Act
## Nev. Rev. Stat. § 598A.010, et seq.
## (On Behalf of the Nevada Class)

190.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

191.   The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities...is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

192.   The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

193.   Plaintiffs purchased pork within the State of Nevada during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

194.   Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

195.   Defendants fixed prices by agreeing to establish prices for pork in Nevada, divided Nevada markets, allocated Nevada customers, and monopolized or attempted monopolize trade or commerce of pork within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq.*

196.   Plaintiffs and members of the Nevada Class were injured with respect to purchases of pork in Nevada in that at least thousands of sales of defendants' pork took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by defendants' conduct.

197.   Accordingly, plaintiffs and members of the Nevada Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

198.   In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by plaintiffs.

### Violation of New Hampshire's Antitrust Statute
### N.H. Rev. Stat. Ann. Tit. XXXI, § 356, et seq.
### (On Behalf of the New Hampshire Class)

199.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

200.  Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.

201.  Plaintiffs purchased pork within the State of New Hampshire during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

202.  Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

203.  Defendants fixed, controlled or maintained prices for pork, allocated customers or markets for pork, and established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

204.  Plaintiffs and members of the New Hampshire Class were injured with respect to purchases of pork in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

## Violation of the New Mexico Antitrust Act
## N.M. Stat. Ann. §§ 57-1-1, et seq.
## (On Behalf of the New Mexico Class)

205.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

206.   The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

207.   Plaintiffs purchased pork within the State of New Mexico during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

208.   Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

209.   Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for pork within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq*.

210.   Plaintiffs and members of the New Mexico Class were injured with respect to purchases of pork in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**Violation of the New York General Business Law**
**N.Y. Gen. Bus. Law § 340**
**(On Behalf of the New York Class)**

211.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

212.    Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

213.    Plaintiffs purchased pork within the State of New York during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

214.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

215.    Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of pork and restrained competition in the free exercise of the conduct of the business of pork within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

216.   Plaintiffs and members of the New York Class were injured with respect to purchases of pork in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

**Violation of the North Carolina General Statutes**
**N.C. Gen. Stat. § 75-1, et seq.**
**(On Behalf of the North Carolina Class)**

217.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

218.   Defendants entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the pork market, a substantial part of which occurred within North Carolina.

219.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

220.   Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

221.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

222. By reason of the foregoing, plaintiffs and members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, *et seq.*

### Violation of the North Dakota Uniform State Antitrust Act
### N.D. Cent. Code § 51-08.1, et seq.
### (On Behalf of the North Dakota Class)

223. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

224. The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. N.D. Cent. Code § 51-08.1, *et seq.*

225. Plaintiffs purchased pork within the State of North Dakota during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

226. Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08.

227. Defendants contracted, combined or conspired in restraint of, or to monopolize trade or commerce in the market for pork, and established, maintained, or used a monopoly, or attempted to do so, for the purposes of

excluding competition or controlling, fixing or maintaining prices for pork, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

228. Plaintiffs and members of the North Dakota Class were injured with respect to purchases in North Dakota and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**Violation of the Oregon Antitrust Law
Or. Rev. Stat. § 646.705, et seq.
(On Behalf of the Oregon Class)**

229. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

230. Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. § 646.715.

231. Plaintiffs purchased pork within the State of Oregon during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

232.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

233.    Defendants contracted, combined, or conspired in restraint of trade or commerce of pork, and monopolized or attempted to monopolize the trade or commerce of pork, in violation of Or. Rev. Stat. § 646.705, *et seq.*

234.    Plaintiffs and members of the Oregon Class were injured with respect to purchases of pork within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

## Violation of the Rhode Island Antitrust Act
## R.I. Gen Laws § 6-36-1, et seq.
## (On Behalf of the Rhode Island Class)

235.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

236.    The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition. R.I. Gen. Laws § 636-2(a)(2).

237.   Plaintiffs purchased pork within the State of Rhode Island during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

238.   Under the Rhode Island Antitrust Act, as of January 1, 2008, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a). In Rhode Island, the claims of plaintiffs and the Class alleged herein run from January 1, 2008, through the date that the effects of defendants' anticompetitive conduct cease.

239.   Defendants contracted, combined and conspired in restraint of trade of pork within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of pork for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, *et seq*.

240.   Plaintiffs and members of the Rhode Island Class were injured with respect to purchases of pork in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

**Violation of the South Dakota Antitrust Statute**
**S.D. Codified Laws § 37-1-3.1, et seq.**
**(On Behalf of the South Dakota Class)**

241. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

242. Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1- 3.1, 3.2.

243. Plaintiffs purchased pork within the State of South Dakota during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

244. Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

245. Defendants contracted, combined or conspired in restraint of trade or commerce of pork within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of pork within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1, *et seq*.

246.   Plaintiffs and members of the South Dakota Class were injured with respect to purchases of pork in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## Violation of the Tennessee Trade Practices Act
## Tenn. Code, § 47-25-101, et seq.
## (On Behalf of the Tennessee Class)

247.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

248.   The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. Tenn. Code, § 47-25-101.

249.   Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, *et seq.*

250. Defendant's conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, defendants' combination or conspiracy had the following effects: (1) price competition for pork was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for pork were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and the Tennessee Class were deprived of free and open competition; and (4) Plaintiffs and the Tennessee Class paid supra-competitive, artificially inflated prices for pork.

251. During the Class Period, defendants' illegal conduct had a substantial effect on Tennessee commerce as pork was sold in Tennessee.

252. Plaintiffs and the Tennessee Class purchased pork within the State of Tennessee during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and the Tennessee Class have been injured in their business and property and are threatened with further injury

253. Under Tennessee law, indirect purchasers (such as plaintiffs and the Tennessee Class) have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint.

254.   Plaintiffs and members of the Tennessee Class were injured with respect to purchases of pork in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

### Violation of the Utah Antitrust Act
### Utah Code Ann. §§ 76-10-911, et seq.
### (On Behalf of the Utah Class)

255.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

256.   The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

257.   Plaintiffs purchased pork within the State of Utah during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

258.   Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

259.  Defendants contracted, combined or conspired in restraint of trade or commerce of pork, and monopolized or attempted to monopolize trade or commerce of pork, in violation of Utah Code Ann. § 76-10-3101, *et seq.*

260.  Plaintiffs and members of the Utah Class who are either Utah residents or Utah citizens were injured with respect to purchases of pork in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

### Violation of the Vermont Consumer Fraud Act
### Vt. Stat. Ann. tit. 9, §2453, *et seq.*
### (On Behalf of the Vermont Class)

261.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

262.  The violations of federal antitrust law set forth above also constitute violations of Vermont Statutes Annotated, title 9, section 2453, *et seq.*

263.  Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Vermont; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont.

During the Class Period, defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 V.S.A. § 2465 *et seq.*

### Violation of the West Virginia Antitrust Act
### W. Va. Code §47-18-1, et seq.
### (On Behalf of the West Virginia Class)

264. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

265. The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

266. During the Class Period, defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of W. Va. Code § 47-18-1, *et seq.*

267. Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

268. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the West Virginia Class have been injured in their business and property in that they paid more for pork than they otherwise would have paid in the absence of defendants' unlawful conduct. As a result

of defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, plaintiffs and members of the West Virginia Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

## Violation of the Wisconsin Antitrust Act
## Wis. Stat. Ann. § 133.01(1), et seq.
## (On Behalf of the Wisconsin Class)

269. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

270. Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

271. Plaintiffs purchased pork within the State of Wisconsin during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

272. Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(a).

273.  Defendants contracted, combined or conspired in restraint of trade or commerce of pork, and monopolized or attempted to monopolize the trade or commerce of pork, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq*.

274.  Plaintiffs and members of the Wisconsin Class were injured with respect to purchases of pork in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for defendants' pork in Wisconsin.

275.  Accordingly, plaintiffs and members of the Wisconsin Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

276.  Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to the Wisconsin Class. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced pork from defendants, and (2) paying higher prices for defendants' pork than they would have in the absence of defendants' conduct. These injuries are of the type of the laws of Wisconsin were designed to prevent, and flow from that which makes defendants' conduct unlawful.

277.  Defendants are jointly and severally liable for all damages suffered by plaintiffs and members of the Wisconsin Class.

**Count 3**
**Violations of State Unfair Trade and Consumer Protection Laws**

278.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

279.   The following legal bases for relief are pled under the consumer protection or similar laws of each jurisdiction identified below, on behalf of the indicated class.

**Violation of Alaska's Unfair Trade Practices and Consumer Protection Act**
**Alaska Stat. § 45.50.471, *et seq.***
**(On Behalf of the Alaska Class)**

280.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

281.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq.*

282.   Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, maintaining, or a combination of these actions, at non-competitive and artificially inflated levels, the prices at which pork at issue was sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

283.   Defendants' conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law. Defendants' unlawful conduct had the following effects: (1) pork at Issue price competition was restrained, suppressed, and eliminated throughout Alaska; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska.

284. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and pork purchasers.

285.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, Plaintiffs and members of the class seek all relief available under that statute.

### Violation of Arkansas's Deceptive Trade Practices Act
### Ark. Code Ann. § 4−8−101, *et seq.*
### (On Behalf of the Alaska Class)

286.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

287.   Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. §4-88-101 *et seq*.

288.   Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, maintaining, or a

combination of these actions, at non-competitive and artificially inflated levels, the prices at which pork at issue was sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the class.

289.    Defendant's conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10).

290.    Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Arkansas; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arkansas.

291.    During the Class Period, defendants' illegal conduct substantially affected Arkansas commerce and consumers.

292.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10) and, accordingly, Plaintiffs and members of the class seek all relief available under that statute.

### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, et seq. (the "UCL")
### (On Behalf of the California Class)

293.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

294. The violations of federal antitrust law set forth above also constitute violations of section 17200, *et seq.* of California Business and Professions Code.

295. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

296. This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these defendants for acts, as alleged herein, that violated the UCL.

297. The defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

298. Defendants' acts, omissions, misrepresentations, practices, and non- disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

299.   Plaintiffs and members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

300.   The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

301.   The unlawful and unfair business practices of defendants, and each of them, as described above, have caused and continue to cause plaintiffs and the members of the California Class to pay supra-competitive and artificially inflated prices for pork sold in the State of California. Plaintiffs and the members of the California Class suffered injury in fact and lost money or property as a result of such unfair competition.

302.   As alleged in this Complaint, defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition. Plaintiffs and the members of the California Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.

**Violation of Colorado's Consumer Protection Act**
**Colorado Rev. Stat. § 6−1−101,** *et seq.*
**(On Behalf of the Colorado Class)**

303.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

304.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6−1−101, *et seq.*

305.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential purchasers of the Defendants' goods and which caused Plaintiffs to suffer injury.

306.  Defendants took efforts to conceal their agreements from Plaintiff.

307.  Defendants' unlawful conduct had the following effects: (1) pork at issue price competition was restrained, suppressed, and eliminated throughout Colorado; (2) pork at issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado.

308.  During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and purchasers of pork.

309.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6−1−101, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

## Violation of Delaware's Consumer Fraud Act
## Del. Code Ann. Tit. 6, §2511, *et seq.*
## (On Behalf of the Delaware Class)

310.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

311.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*

312.    Defendants sold the pork at issue in Delaware during the Class Period and deceived plaintiffs and class members in Delaware into believing that the pork at issue were competitively priced.

313.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, maintaining, or a combination of such activities, at artificial and non-competitive levels, the prices at which pork at issue was sold, distributed, or obtained in Delaware.

314. Defendants deliberately failed to disclose material facts to Plaintiffs concerning Defendants' unlawful activities and artificially inflated prices for pork at issue.

315. Defendants misrepresented to all purchasers during the Class Period that Defendants' pork at issue prices were competitive and fair.

316. Defendants' unlawful conduct had the following effects: (1) pork at issue price competition was restrained, suppressed, and eliminated throughout Delaware; (2) pork at issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware.

317. During the Class Period, Defendants' illegal conduct substantially affected Delaware commerce and purchasers of pork. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq*., and, accordingly, Plaintiffs and members of the class seek all relief available under that statute.

**Violation of the District of Columbia Consumer Protection
Procedures Act
D.C. Code § 28-3901, et seq.
(On Behalf of the District of Columbia Class)**

318. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

319.  Plaintiffs and members of the District of Columbia Class purchased pork for personal, family, or household purposes.

320.  By reason of the conduct alleged herein, defendants have violated D.C. Code § 28-3901, *et seq.*

321.  Defendants are "merchants" within the meaning of D.C. Code § 28- 3901(a)(3).

322.  Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broiler market, a substantial part of which occurred within the District of Columbia.

323.  Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Broiler Market.

324.  Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

325.  Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

326.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the District of Columbia Class have been injured in their business or property and are threatened with further injury.

327.   By reason of the foregoing, plaintiffs and members of the District of Columbia Class are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code § 28-3901, *et seq.*

**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. § 501.201(2), et seq.**
**(On Behalf of the Florida Class)**

328.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

329.   The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

330.   The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

331.  A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

332.  Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

333.  Plaintiffs purchased pork within the State of Florida during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

334.  Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Florida.

335.  Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for pork, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2008 and continuing through the date of this filing.

336. Accordingly, defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

337. Defendants' unlawful conduct substantially affected Florida's trade and commerce.

338. As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Florida Class have been injured in their business or property by virtue of overcharges for pork and are threatened with further injury.

339. By reason of the foregoing, plaintiffs and the members of the Florida Class is entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

**Violation of Georgia's Uniform Deceptive Trade Practices Act
Ga. Code Ann. §10−1−370, *et seq*.
(On Behalf of the Georgia Class)**

340. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

341.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.*

342.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, maintaining, or a combination of such activities, at artificial and non-competitive levels, the prices at which pork at issue was sold, distributed, or obtained in Georgia.

343.    Defendants deliberately failed to disclose material facts to Plaintiffs and members of the class concerning Defendants' unlawful activities and artificially inflated prices for pork at issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' pork at issue prices were competitive and fair.

344.    Defendants' unlawful conduct had the following effects: (1) pork at issue price competition was restrained, suppressed, and eliminated throughout Georgia; (2) pork at issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia.

345.    During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and purchasers of pork.

346.    As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and

deceptive commercial practices as set forth above and are threatened with further injury.

347. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of pork at issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing pork at issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia Code § 10-1-370, *et seq.*, and, accordingly, Plaintiffs and members of the class seek all relief available under that statute and as equity demands.

### Violation of Hawaii's Laws Regarding Unfair Trade Practices
### Hawaii Revised Statutes Annotated §§ 480-1, et seq.
### (On Behalf of the Hawaii Class)

348. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

349. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

350. Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed, and eliminated throughout

Hawaii; (2) pork prices were, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Hawaii Class were deprived of free and open competition; and (4) Plaintiffs and members of the Hawaii Class paid supra-competitive, artificially inflated prices for pork.

351.   During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

352.   As a direct and proximate result of Defendants' unlawful conduct, plaintiffs and members of the Hawaii Class have been injured and are threatened with further injury.

**Violation of Illinois's Consumer Fraud and
Deceptive Business Practices Act
815 Ill. Comp. Stat. Ann. 505/10a, et seq.
(On Behalf of the Illinois Class)**

353.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

354.   By reason of the conduct alleged herein, defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*

355.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or

commerce in the pork market, a substantial part of which occurred within Illinois.

356.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

357.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

358.   Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the classes.

359.   Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

360.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Illinois Class were actually deceived and have been injured in their business or property and are threatened with further injury.

361.   By reason of the foregoing, plaintiffs and members of the Illinois Class are entitled to seek all forms of relief, including actual damages or any

other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10a*, et seq.*

### Violation of the Massachusetts Consumer Protection Act
### Mass. Gen. Laws Ch. 93A § 1, et seq.
### (On Behalf of the Massachusetts Class)

362.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

363.    Plaintiffs reserve their right to bring a claim under Mass. Gen. Laws Ch. 93A *et seq.* Pursuant to Mass. Gen. Laws Ch. 93A § 9, plaintiffs served all defendants on June 27, 2018, via certified mail, return receipt requested, Demand for Payment Letters. In accordance with the statute, these letters explained the unfair acts, the injury suffered, and requested relief from the defendants within 30 days. If necessary, plaintiffs will amend to add specific claims under Mass. Gen. Laws Ch. 93A *et seq.*

### Violation of the Michigan Consumer Protection Act
### Mich. Comp. Laws Ann. § 445.901, et seq.
### (On Behalf of the Michigan Class)

364.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

365.    By reason of the conduct alleged herein, defendants have violated Mich. Comp. Laws Ann. § 445.901, *et seq.*

366. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Michigan.

367. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Michigan.

368. Defendants' conduct was conducted with the intent to deceive Michigan consumers regarding the nature of defendants' actions within the stream of Michigan commerce.

369. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Michigan.

370. Defendants' conduct misled consumers, withheld material facts, and took advantage of plaintiffs and members-of-the-classes' inability to protect themselves.

371. Defendants' unlawful conduct substantially affected Michigan's trade and commerce.

372. As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Michigan Class have been injured in their business or property and are threatened with further injury.

373.   By reason of the foregoing, plaintiffs and the Michigan Class are entitled to seek all forms of relief available under Mich. Comp. Laws Ann. § 445.911.

### Violation of the Minnesota Consumer Fraud Act
### Minn. Stat. § 325F.68, et seq.
### (On Behalf of the Minnesota Class)

374.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

375.   By reason of the conduct alleged herein, defendants have violated Minn. Stat. § 325F.68, et seq.

376.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

377.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Minnesota, for the purpose of controlling, fixing, or maintaining prices in the pork market.

378.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

379.   Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive

act or practice committed by a supplier in connection with a consumer transaction.

380.   Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

381.   Defendants' conduct was willful.

382.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Minnesota Class have been injured in their business or property and are threatened with further injury.

383.   By reason of the foregoing, plaintiffs and the members of the Minnesota Class are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, et seq. and applicable case law.

## Violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970 Mont. Code, §§ 30-14-103, et seq., and §§ 30-14-201, et. seq. (On Behalf of the Montana Class)

384.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

385.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana

Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq*., and §§ 30-14-201, *et. seq.*

386.    Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed, and eliminated throughout Montana; (2) pork prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Montana Class were deprived of free and open competition; and (4) Plaintiffs and members of the Montana Class paid supra-competitive, artificially inflated prices for pork.

387.    During the Class Period, defendants' illegal conduct substantially affected Montana commerce and consumers.

388.    As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Montana Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq*., and §§ 30-14-201, *et. seq*., and, accordingly, plaintiffs and members of the Montana Class seek all relief available under that statute.

## Violation of the Nebraska Consumer Protection Act
### Neb. Rev. Stat. § 59-1602, et seq.
### (On Behalf of the Nebraska Class)

389.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

390.  By reason of the conduct alleged herein, defendants have violated Neb. Rev. Stat. § 59-1602, *et seq.*

391.  Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Nebraska.

392.  Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

393.  Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of defendants' actions within the stream of Nebraska commerce.

394.  Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

395.   Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs and members of the Nevada Class's ability to protect themselves.

396.   Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

397.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Nebraska Class have been injured in their business or property and are threatened with further injury.

398.   By reason of the foregoing, plaintiffs and members of the Nebraska Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59- 1614.

### Violation of the Nevada Deceptive Trade Practices Act
### Nev. Rev. Stat. § 598.0903, et seq.
### (On Behalf of the Nevada Class)

399.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

400.   By reason of the conduct alleged herein, defendants have violated Nev. Rev. Stat. § 598.0903, *et seq.*

401.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

402. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

403. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

404. Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

405. Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

406. Defendants' conduct was willful.

407. As a direct and proximate cause of defendants' unlawful conduct, the members of the Nevada Class have been injured in their business or property and are threatened with further injury.

408. By reason of the foregoing, the Nevada Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

## Violation of the New Hampshire Consumer Protection Act
## N.H. Rev. Stat. Ann. Tit. XXXI, § 358-A, et seq.
## (On Behalf of the New Hampshire Class)

409.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

410.   By reason of the conduct alleged herein, defendants have violated N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, *et seq.*

411.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within New Hampshire.

412.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

413.   Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of defendants' actions within the stream of New Hampshire commerce.

414.   Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

415.   Defendants' conduct was willful and knowing.

416.   Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs and members of the New Hampshire Class's ability to protect themselves.

417.   Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

418.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the New Hampshire Class have been injured in their business or property and are threatened with further injury.

419.   By reason of the foregoing, plaintiffs and the members of the New Hampshire Class are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

### Violation of the New Mexico Unfair Practices Act
### N.M. Stat. Ann. §§ 57-12-3, et seq.
### (On Behalf of the New Mexico Class)

420.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

421.   By reason of the conduct alleged herein, defendants have violated N.M. Stat. Ann. §§ 57-12-3, *et seq.*

422.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or

commerce in the pork market, a substantial part of which occurred within New Mexico.

423.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

424.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

425.   Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the New Mexico Class.

426.   Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

427.   Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the New Mexico Class members and the price paid by them for pork as set forth in N.M. Stat. Ann. § 57-12-2E.

428.   Defendants' conduct was willful.

429.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the New Mexico Class have been injured in their business or property and are threatened with further injury.

430.   By reason of the foregoing, plaintiffs and members of the New Mexico Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

### Violation of New York's General Business Law
### N.Y. Gen. Bus. Law § 349, *et seq.*
### (Oh Behalf of the New York Class)

431.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

432.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*.

433.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, maintaining, or a combination of those activities, at artificial and non-competitive levels, the prices at which pork were sold, distributed or obtained in New York and took efforts to conceal their agreements from plaintiffs and members of the class.

434.  Defendants and their coconspirators made public statements about the prices of pork that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for pork; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

435.  Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased pork were misled to believe that they were paying a fair price for pork or the price increases for pork were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy.

436.  Defendants knew that their unlawful trade practices with respect to pricing pork would have a broad impact, causing commercial and institutional indirect food preparer class members who indirectly purchased pork to be injured by paying more for pork than they would have paid in the absence of Defendants' unlawful trade acts and practices.

437.  The conduct of Defendants described herein constitutes deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injury and broad adverse impact on the public at large, and harmed the public interest of customers and commercial and institutional indirect food preparers in New York State in an honest marketplace in which

economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed, and eliminated throughout New York; (2) pork prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York.

438.   During the Class Period, Defendants marketed, sold, or distributed pork in New York, and Defendants' illegal conduct substantially affected New York commerce.

439.   Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

## Violation of the North Carolina Unfair Trade and Business Practices Act
### N.C. Gen. Stat. § 75-1.1, et seq.
### (On Behalf of the North Carolina Class)

440.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

441.   By reason of the conduct alleged herein, defendants have violated N.C. Gen. Stat. § 75-1.1, *et seq.*

442.   Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within North Carolina.

443. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

444. Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

445. Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the North Carolina Class.

446. Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

447. Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

448. As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

449. By reason of the foregoing, plaintiffs and the members of the North Carolina Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 7516.

## Violation of the North Dakota Unfair Trade Practices Law
## N.D. Cent. Code § 51-10, et seq.
## (On Behalf of the North Dakota Class)

450.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

451.   By reason of the conduct alleged herein, defendants have violated N.D. Cent. Code § 51-10-01, et seq.

452.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

453.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within North Dakota, for the purpose of controlling, fixing, or maintaining prices in the pork market.

454.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Dakota.

455.   Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

456.   Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

457.   Defendants' conduct was willful.

458.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Dakota Class have been injured in their business or property and are threatened with further injury.

459.   By reason of the foregoing, plaintiffs and the members of the North Dakota Class are entitled to seek all forms of relief, including damages and injunctive relief under N.D. Cent. Code § 51-10-06.

**Violation of the Oregon Unlawful Trade Practices Act**
**Or. Rev. Stat. § 646.605, et seq.**
**(On Behalf of the Oregon Class)**

460.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

461.   By reason of the conduct alleged herein, defendants have violated Or. Rev. Stat. § 646.608, *et seq.*

462.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Oregon.

463.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

464.  Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of defendants' actions within the stream of Oregon commerce.

465.  Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

466.  Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs' and members of the Oregon Class's ability to protect themselves.

467.  Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

468.  As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Oregon Class have been injured in their business or property and are threatened with further injury.

469.  By reason of the foregoing, plaintiffs and the members of the Oregon Class are entitled to seek all forms of relief available under Or. Rev. Stat. § 646.638.

470.  Pursuant to section 646.638 of the Oregon Unlawful Trade Practices Act, with the filing of this action, a copy of this Complaint is being served upon the Attorney General of Oregon.

**Violation of the Rhode Island Deceptive Trade Practices Act
R.I. Gen. Laws § 6-13.1-1, et seq.
(On Behalf of the Rhode Island Class)**

471.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

472.   By reason of the conduct alleged herein, defendants have violated R.I. Gen Laws § 6-13.1-1, *et seq.*

473.   Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

474.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Rhode Island, for the purpose of controlling, fixing, or maintaining prices in the pork market.

475.   Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

476.   Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

477.   Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

478.   Defendants' conduct was willful.

479. Defendants deliberately failed to disclose material facts to plaintiffs and members of the Rhode Island Class concerning defendants' unlawful activities, including the horizontal conspiracy and artificially-inflated prices for pork.

480. Defendants' deception, including its affirmative misrepresentations and/or omissions concerning the price of pork, constitutes information necessary to plaintiffs and members of the Rhode Island Class relating to the cost of pork purchased.

481. Plaintiffs and members of the Rhode Island class purchased goods, namely pork, primarily for personal, family, or household purposes.

482. As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Rhode Island Class have been injured in their business or property and are threatened with further injury.

483. By reason of the foregoing, plaintiffs and the members of the Rhode Island Class are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. Gen Laws § 6-13.1-5.2.

### Violation of the South Carolina's Unfair Trade Practices Act
### S.C. Code Ann. §§ 39-5-10, et seq.
### (On Behalf of the South Carolina Class)

484.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

485.  By reason of the conduct alleged herein, defendants have violated S.C. Code Ann. §§ 39-5-10.

486.  Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within South Carolina.

487.  Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

488.  Defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of defendants' actions within the stream of South Carolina commerce.

489.  Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

490.   Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs' and members of the South Carolina Class's ability to protect themselves.

491.   Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

492.   Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as nearly all members of the public purchase and consume pork.

**Violation of the South Dakota Deceptive Trade Practices
and Consumer Protection Law
S.D. Codified Laws § 37-24, et seq.
(On Behalf of the South Dakota Class)**

493.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

494.   By reason of the conduct alleged herein, defendants have violated S.D. Codified Laws § 37-24-6.

495.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

496.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market,

a substantial part of which occurred within South Dakota, for the purpose of controlling, fixing, or maintaining prices in the pork market.

497.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Dakota.

498.   Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

499.   Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

500.   Defendants' conduct was willful.

501.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the South Dakota Class have been injured in their business or property and are threatened with further injury.

502.   By reason of the foregoing, plaintiffs and the members of the South Dakota Class are entitled to seek all forms of relief, including actual damages and injunctive relief under S.D. Codified Laws § 37-24-31.

**Violation of the Vermont Consumer Fraud Act**
**Vt. Stat. Ann. tit. 9, §2453, et seq.**
**(On Behalf of the Vermont Class)**

503.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

504. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Vermont Statutes Annotated, title 9, section 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, maintaining, or a combination of those activities, at artificial and non-competitive levels, the prices at which pork were sold, distributed, or obtained in Vermont.

505. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the class concerning Defendants' unlawful activities and artificially inflated prices for pork. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' pork prices were competitive and fair.

506. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers.

507. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions

concerning the price of pork, misled all commercial and institutional indirect food preparer purchasers acting reasonably under the circumstances to believe that they were purchasing pork at prices set by a free and fair market.

508. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the class seek all relief available under that statute.

### Violation of West Virginia's Consumer Credit and Protection Act
### W. Va. Code § 46A−6−101, *et seq.*
### (On Behalf of the West Virginia Class)

509. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

510. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, maintaining, or a combination of such activities, at artificial and non-competitive levels, the prices at which pork at issue was sold, distributed, or obtained in West Virginia.

511. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the class concerning Defendants' unlawful activities and artificially inflated prices for pork at Issue. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' pork at issue prices were competitive and fair.

512. Defendants' unlawful conduct had the following effects: (1) price competition for the pork at issue was restrained, suppressed, and eliminated throughout West Virginia; (2) pork at issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and purchasers of pork.

513. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of pork at issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing pork at issue at prices set by a free and fair market.

514. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the class as they related to the cost of pork at issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*., and, accordingly, Plaintiffs and members of the class seek all relief available under that statute.

## Violation of Wisconsin's Deceptive Trade Practices Act
## Wisc. Stat. § 100.18, *et seq*.
## (On Behalf of the Wisconsin Class)

515. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

516. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Wisconsin's Deceptive Trade Practices Act, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, maintaining, or a combination of those activities, at artificial and non-competitive levels, the prices at which pork at issue was sold, distributed, or obtained in Wisconsin.

517. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' pork at issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price

competition for the pork at issue was restrained, suppressed, and eliminated throughout Wisconsin; (2) pork at issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin.

518. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of pork. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

519. Defendants' deception, including their affirmative misrepresentations concerning the price of pork at issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing pork at issue at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the class as they related to the cost of pork at issue they purchased.

520. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, Plaintiffs and members of the class seek all relief available under that statute.

## COUNT 4
## UNJUST ENRICHMENT

521.   Plaintiffs   incorporate   by   reference   the   allegations   in   the preceding paragraphs.

522.   To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

523.   Defendants  have  unlawfully  benefited  from  their  sales  of  pork because  of  the  unlawful  and  inequitable  acts  alleged  in  this  Complaint. Defendants   unlawfully   overcharged   privately   held   commercial   and institutional  indirect  food  preparers,  which  purchased  pork  at  prices  that were more than they would have been but for Defendants' unlawful actions.

524.   Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the class.

525.   Plaintiffs  and  the  class  have  conferred  upon  Defendants  an economic   benefit,   in   the   nature   of   profits   resulting   from   unlawful overcharges, to the economic detriment of Plaintiffs and the class.

526.  Defendants  have  been  enriched  by  revenue  resulting  from unlawful overcharges for pork while Plaintiffs have been impoverished by the overcharges  they  paid  for  pork  imposed  through  Defendants'  unlawful

conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

527. There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the class, because Plaintiffs and the class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

528. Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

529. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of pork.

530. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of pork are ascertainable by review of sales records.

531. It would be futile for Plaintiffs and the class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the class with respect to Defendants' sales of pork.

532.   It would be futile for Plaintiffs and the class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased pork, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the class for Defendants' unlawful conduct.

533.   The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for pork is a direct and proximate result of Defendants' unlawful practices.

534.   The financial benefits derived by Defendants rightfully belong to Plaintiffs and the class, because Plaintiffs and the class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

535.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except California, Ohio and Indiana,[41] for Defendants to be

---

[41] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia,

permitted to retain any of the overcharges for pork derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

536.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as pork prices remain inflated above preconspiracy levels.

537.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the class all unlawful or inequitable proceeds they received from their sales of pork.

538.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of pork by Plaintiffs and the class. Plaintiffs and the class have no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the classes of all others so similarly situated, respectfully requests judgment against defendants as follows:

---

Washington, West Virginia,  Wisconsin and Wyoming as well as the District of Columbia and Puerto Rico.

539.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

540.   The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

541.   Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgment in favor of plaintiffs and the members of the Classes be entered against defendants in an amount to be trebled to the extent such laws permit;

542.   Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination

having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

543.   Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

544.   Plaintiffs and the members of the classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

545.   Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

546.   Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: July 23, 2018                    ZIMMERMAN REED LLP


                                        By:  *s/David M. Cialkowski*
                                        J. Gordon Rudd, Jr., MN 222082
                                        David M. Cialkowski, MN 0306526
                                        Behdad C. Sadeghi MN 393374
                                        1100 IDS Center
                                        80 South 8th Street
                                        Minneapolis, MN 55402
                                        T: 612.341.0400
                                        gordon.rudd@zimmreed.com
                                        david.cialkowski@zimmreed.com
                                        behdad.sadeghi@zimmreed.com

                                        Robert J. Pavich
                                        John J. Pavich
                                        PAVICH LAW GROUP, P.C.
                                        30 West Monroe Street, Suite 1310
                                        Chicago, Illinois 60603
                                        T: (312) 690-8400
                                        rpavich@pavichlawgroup.com
                                        jpavich@pavichlawgroup.com

                                        *Counsel for plaintiffs and the proposed*
                                        *indirect purchaser classes*